LELAND L. PEARSON ET AL. *v.* SIMON R. KENDRICK ET AL.

1. PRIVILEGE TAX. *License. Insufficient payment. Code* 1892, § 3401.

The payment of an insufficient privilege tax is the same as no payment at all in its effects upon contracts made in reference to the business carried on by the delinquent in violation of law.

2. SAME. *Date of license.*

A privilege license relates back to the first day of the month in which it is issued, and by no recital therein, or antedating, can it be made to relate back to a more remote period.

3. SAME. *Contracts in reference to business.*

A 'note payable to themselves, and deed of trust to secure the same, taken by a mercantile firm while carrying on a credit business in violation of the privilege tax law, constitute a contract in reference to such business, and are subject to the penalties of that law, although the firm borrowed the money from a third person to pay an obligation of the debtor to another mercantile firm, when their character as the lenders of the money, in addition to the form of the note and trust deed, is further manifested by the facts that by the terms of the trust deed they were also bound to advance supplies to the grantor for the current year; that they charged him commissions for advancing the money necessary to pay the other firm; and that, as partners in such other firm, they received a large part of the money so realized.

FROM the chancery court of Bolivar county.

HON. A. H. LONGINO, Chancellor.

In the year 1889, W. H. Jeffreys was doing business as a merchant in his own name at Duncan, in Bolivar county, Mississippi, and continued in the mercantile business, alone, until some time during the month of January, 1890, he formed a

partnership with Burbridge & Houston, under the firm name of W. H. Jeffreys & Co.; Jeffreys owning a one-third interest in the firm.    At that time, and for a number of years subsequent thereto, Burbridge & Houston were doing a mercantile business in Panola county, at Batesville, Mississippi.

The appellee, Kendrick, did a credit business with W. H. Jeffreys in 1889, and, at the time of the formation of the partnership of W. H. Jeffreys & Co., Kendrick owed Jeffreys a balance on open account of $200.83, and also owed to one Block a balance of $803.17, on which interest had accumulated to the amount of $100.40, and after the formation of the partnership of W. H. Jeffreys & Co., they, Jeffreys & Co., at the request of Kendrick, as they allege, purchased or paid off the account to Block, and Kendrick then executed his note to Jeffreys & Co. for $1,104.47, the balance due on his dealings with Block and W. H. Jeffreys, securing the said note by a trust deed on his property in Bolivar county, Mississippi, and thereafter, during the year 1890, continued to do a credit business with W. H. Jeffreys & Co.    At the close of the year 1890, Jeffreys claimed that there was a balance due thereon, then amounting to about $2,700.

About this time Kendrick applied to Burbridge & Houston, composed of W. P. Burbridge and R. P. Houston, who were then the partners of Jeffreys, and, together with him, composing the firm of Jeffreys & Co., and arranged with them to advance him the sum of $3,000, which appellants claim was for the purpose of paying off the account of Jeffreys & Co.; the balance, after the payment of the account, to be used by Kendrick in supplies and merchandise obtained from Jeffreys & Co. Kendrick, on the other hand, claimed that he was to get the $3,000 in cash to enable him to make a payment on the purchase money due on his farm, mentioned in the trust deed, and to enable him to buy additional mules and to clear and cultivate more land.

Burbridge & Houston borrowed from R. H. Moore $3,000,

and placed the same to the credit of S. R. Kendrick on the books of W. H. Jeffreys & Co. As security for this sum, Kendrick and wife, the appellees, on January 27, 1891, executed and delivered to Burbridge & Houston their promissory note for $3,075, and secured the same by a trust deed on said lands, and upon two mules, one horse and wagon, and also upon all of the crops of cotton and agricultural products to be raised on the lands during the year, the trust deed providing for the payment and security of the said promissory note, and also for such further advances as might be made to the said S. R. Kendrick by Burbridge & Houston during the year 1891.

On the fifth of March, 1892, it being claimed that the appellee, Kendrick, was indebted to .Burbridge & Houston in the sum of $4,093.84, represented by the promissory note for $3,075, then past due and unpaid, and the remainder of the said sum being the balance due Burbridge & Houston on the business of S. R. Kendrick for supplies advanced him during the year 1891, and on the said fifth day of March, 1892, Kendrick and wife executed in favor of Burbridge & Houston their trust deed securing two notes; one of said notes being the note for $3,075 above mentioned, and the other being for $1,018.84, and for such further advances as should be made to Kendrick during the year 1892. They continued their business relations under these instruments until the seventh of April, 1894, at which time it was claimed that S. R. Kendrick was indebted to Burbridge & Houston upon his open account, exclusive of the $3,075 note, in the sum of $1,888.65, and, accordingly, on that date, April 7, 1894, he and his wife executed and delivered to Burbridge & Houston their promissory note for $1,888.65, securing the same, together with such further advances as should be made to them during the year 1894, by another trust deed to L. D. Nickles, trustee, conveying the lands above mentioned. This note for $1,888.65 represented, or was said to represent, the full balance due by Kendrick on all advances made to him by Bur-

bridge & Houston, exclusive of the balance due on the note for
$3,075.

On the first day of January, 1895, there was a payment of
$308.66 made by Kendrick, which amount was duly credited
on the back of the note of $1,888.65 last mentioned.    The ap-
pellants claim that with the exception of this credit of $308.66
no part of either of the said notes of $3,075 or of $1,888.65
has ever been paid, but that the entire balance due on the said
notes remains now wholly due and unpaid.

The appellee, Kendrick, claims that there is nothing due on
either of said notes, and that the appellants have no right to
recovery thereon, because he claims that he is entitled to credit
in his account with Burbridge & Houston, and with W. H.
Jeffreys & Co., for numerous items of overcharge, and of er-
roneous charges, and of usurious charges in their accounts, a
statement of which is in the record.

The appellant, Pearson, is the owner of the said promissory
notes and trust deed by purchase and regular assignment to
him of the same.

On August 11, 1896, Wright and Nickles, trustees named
in the trust deeds, and L. L. Pearson, filed their bill in the
chancery court of Bolivar county, setting up their rights under
the trust deeds, asking foreclosure and the appointment of a
receiver.    The receiver was appointed, but afterwards a decree
discharging the receiver was rendered, from which another
appeal was prosecuted to this court, and the decree discharging
the receiver was reversed and the cause remanded to the chan-
cery court for further proceedings.    *Pearson* v. *Kendrick,* 74
Miss., 235.

On October 15, 1896, under the terms of the trust deed,
the lands were advertised for sale, and were purchased by the
appellant, Pearson, who received deeds therefor, which are at-
tached to the supplemental bill as exhibits thereto.    After the
sale of the lands, and the purchase thereof by Pearson, he filed
his supplemental bill against the appellees and against Wright

and Nickles, who were made defendants to the supplemental bill, in which Pearson reiterated all of the charges and complaints made in the original bill, and alleged that since the last term of the chancery court (September, 1896) he had purchased the lands at the trustee's sale above mentioned, receiving deeds therefor, which he attached as exhibits to the supplemental bill, and that, by virtue of these conveyances to him, he became and was the owner of the land, and that all of these matters had arisen since the filing of the original bill, and since the last term of the court, and that he, Pearson, was entitled to have his interest in the lands established and his title thereto confirmed, and that if mistaken, he was still entitled to insist upon the prayer of the original bill; the ascertainment of the amount due on the said notes and the foreclosure of the liens as therein prayed.

The appellees answered, denying the rights of appellant, Pearson; denying all the equity in the bill; denying the indebtedness on the notes, and denying that the notes constituted a legal charge, because of the failure on the part of W. H. Jeffreys & Co., or of W. H. Jeffreys, or of Burbridge & Houston, to take out proper privilege licenses, as provided for by the laws of this state.

A large amount of testimony was taken by both parties, the said Kendrick denying, by his own deposition and evidence, that he ever had a full settlement of his accounts with W. H. Jeffreys & Co., or with W. H. Jeffreys alone, or with Burbridge & Houston.

Houston testifies that Kendrick had repeatedly acknowledged the correctness of the account; that he had never disputed the same at all, and that he was always fully aware of the claims against him, and always acknowledged the correctness and justice of those claims. Jeffreys also testifies that he had repeatedly given Kendrick statements of his account, while he (Kendrick) was dealing with him (W. H. Jeffreys or W. H. Jeffreys & Co.), and that at no time had Kendrick ever disputed the account, but, on the contrary, had acknowledged the cor-

rectness of the same, and that it was justly due. Copies of the account of Kendrick with W. H. Jeffreys and with W. H. Jeffreys & Co., were placed in evidence, and it appears by pencil memoranda on said accounts that at different times statements were regularly rendered to him.

It further appears from the account of Kendrick with W. H. Jeffreys & Co., that he was, on February 3, 1891, credited by cash $3,000, and that he was charged on said account, February 3, 1891, with his note for $1,104.47, and interest thereon $27.61, making a total of $1,132.08, with note for $770 and interest $19.25, making a total of $789.25, and with note for $344.80, and that he continued to obtain goods on his account to February 27, 1891, at which time he ceased to have any further dealing whatever with W. H. Jeffreys or W. H. Jeffreys & Co. The two notes of $770 and $344.80 were notes due by Kendrick for the purchase money on a gin outfit and machinery purchased from Block, as shown by the testimony in the cause, and by the gin account in evidence in the record. The note for $3,075 was never charged against Kendrick in the account with W. H. Jeffreys & Co., or in his account with Burbridge & Houston, this account showing only the mercantile transactions between the parties, exclusive of the loan of $3,000 above mentioned. The books of Burbridge & Houston showed, however, that they received two and one-half per cent. commissions for advancing the $3,000.

R. P. Houston testifies that Burbridge & Houston, at the special instance and request of Kendrick, paid the account of Kendrick with W. H. Jeffreys & Co., and that they, Burbridge & Houston, obtained the money for this purpose by borrowing the same from R. H. Moore, as above stated, they giving Moore their own note for that amount, and the note and trust deed of Kendrick as collateral security. Moore was settled with before the institution of the suit, and was without interest in the result of the same. As shown by affidavit of Houston, the debt to W. H. Jeffreys & Co., to which the $3,000 was

applied, had been transferred to Houston & Burbridge before the execution of the note and trust deed of January 27, 1891, in favor of the latter firm.

No privilege license issued to M. F. Block or to W. H. Jeffreys or to Jeffreys & Co. was produced, but the privilege tax book in the sheriff's office in Bolivar county showed that W. H. Jeffreys, in March, 1890, paid, presumably for W. H. Jeffreys & Co., a privilege tax of $15, and Kendrick testifies that they carried a stock of goods largely in excess of $5,000, and a memorandum on the merchandise account of W. H. Jeffreys & Co. showed that they charged that account with merchandise exceeding $5,000 in January, 1891. The transcript from the sheriff's book in Panola county showed that Burbridge & Houston, in their mercantile business in Panola county, took out licenses as follows :

"$20.00 for 1891.   License issued November 16, 1891; time run, from January 1, 1891, to January 1, 1892.

"$20.00 for 1892.   License issued April 26, 1892; time to run, from January 1, 1892, to January 1, 1893.

"$ 5.00 for 1892, in May; additional amnesty act.

"$30.00 for 1893.   License issued January 1, 1893; to run, January 1, 1893, to January 1, 1894.

"$25.00 for 1894.   License issued April 25, 1894; time to run, January 1, 1894, to January 1, 1895."

On February 8, 1895, Burbridge & Houston made an assignment, a copy of which is incorporated in the record, in which they estimate their stock of goods, wares and merchandise, furniture and fixtures, in their store in Batesville, Miss., at $9,000, and Burbridge valued the furniture and fixtures at $200.

Houston, in his deposition, stated that in 1891 Burbridge & Houston, in their business at Batesville, Miss., carried a stock of goods which did not, at any time during the year 1891, exceed $5,000, and that during the year 1892 their stock

never exceeded $7,000, and that during the year 1894 their stock ran from $5,000 to $6,000—never exceeding $6,000 at any time during the year. But he also stated that the amount of stock on hand at the time of his firm's assignment ($8,800) was not less than they carried in 1891, 1892, and 1894, when the several trust deeds were given by Kendrick and wife.

Judge Butt, a witness for appellees, states that he had conversations with both Houston and Burbridge, in which they told him that Burbridge & Houston carried stock to an amount in excess of what they are shown to have been licensed to carry. This statement is denied by R. P. Houston so far as it related to him.

By the act of March 7, 1892, persons in default for non-payment of privilege taxes were relieved from the penalties imposed by § 589, code 1892, upon payment, within sixty days next after said date, of the true amount of privilege taxes remaining unpaid for three years next preceding said date and twenty-five per centum additional. Laws 1892, pp. 31, 32.

On final hearing a decree was rendered dismissing the bill and ordering the receiver to turn over all the property in his hands. From this decree the appellants have prosecuted this appeal.

*Cooper & Waddell,* for the appellants.

The privilege tax law does not invalidate all contracts made by an individual who, as a merchant, transacts business without paying the proper privilege tax. It is only contracts made in and about any illegally transacted mercantile business that the statute condemns. The contract in question was not only a contract by Kendrick with the mercantile firm of Burbridge & Houston, at Batesville, but was a contract with them as individuals, lately composing the firm of W. H. Jeffreys & Co. It was not a contract either with Jeffreys & Co., doing business at Duncan, in Bolivar county, nor with Burbridge & Houston, doing business at Batesville, in Panola county. W. H. Jeffreys

& Co. were no parties to the contract, and if Burbridge & Houston were parties, it was not a contract in reference to the business transacted by them at Batesville, and for which it was necessary that a license should be taken out. We do not contend that a merchant who advances cash to a customer as a part of a current account or as incident to a business illegally transacted, may recover the money on the ground that his business was not that of money lending, and thus separate an indivisible transaction. Our proposition is far different. The loan of the $3,000 had no relation to the mercantile business transacted by Burbridge & Houston, Batesville, and it would have been made if those gentlemen had not been engaged in that business at all. The purpose for which the loan was made was to secure the payment of the debt to another firm, of which firm it happened that these gentlemen had been partners. *Orum* v. *Shoe Co.*, 72 Miss., 458.

The testimony of J. T. Butt as to admissions made by the partners of the firm of Burbridge & Houston, touching the amount of stock carried by them in their store at Batesville, was inadmissible, for the reason that they were made after the general assignment executed by that firm. *Brown* v. *McGrow*, 12 Smed. & M., 267; *Padgett* v. *Lawrence*, 40 Am. Dec., 232; *Taylor* v. *Webb*, 54 Miss., 36, and cases cited in 9 Am. & Eng. Enc. L., note 3, p. 346.

We further submit to the court that, whatever may be the facts in reference to the payment of proper privilege taxes for the years before 1894, by any or all of the merchants with whom the defendant dealt, if the firm of Burbridge & Houston paid a proper privilege tax on the seventh day of April, 1894, when the mortgage securing the note for $1,888.65, dated that day was given, the complainant is entitled to relief as to that note. According to the averments of the bill, and the admissions of the defendant in his answer, a note for that amount was on that day given, and a mortgage executed for its security. Now, let us assume that the account up to date, and

including the year 1893, could not have been sued on by Burbridge & Houston, for the reason that they had not paid the proper privilege taxes for the years in which the debt had been contracted. Let us further assume that early in the year 1894 this firm did pay a proper privilege tax for that year, and after this the defendant gave a new note, made a new contract resting upon the old unenforceable indebtedness for its consideration. The question, upon such assumptions, is whether the new contract is within the condemnation of the statute. We confidently submit that it is not.

The code of 1892, § 3901, does not make the contract entered into by the unlicensed dealer void, as did that under which the cases of *Anding* v. *Levy*, 57 Miss., 51, and *Decell* v. *Lewenthall*, 57 Miss., 331, were decided. The sole effect of the statute is to prevent the delinquent dealer from basing any claim, by suit in the courts, upon the contract made in violation of its terms. A new contract resting upon the unenforceable (and, therefore, imperfect) one for its consideration, is not within the letter or spirit of the statute, as distinctly held in *Crum* v. *Shoe Co.*, 72 Miss., 458, and in *Bank* v. *Railroad Co.*, 65 Miss., 365. The statute is a highly penal one, and should not be extended by construction. Notwithstanding the fact that a merchant has failed to pay his privilege tax, there is an obligation —an imperfect and unenforceable one—resting upon him who has dealt with such person, to pay the debt he owes as a condition of securing equitable relief. *Deans* v. *Robertson*, 64 Miss., 195; *Bowdre* v. *Carter*, 64 Miss., 221. In other words, the courts will lend their aid to neither party. They will not aid the delinquent merchant, because he has failed to perform his duty to the state; they will not aid the delinquent debtor, because he has failed to discharge his duty to the delinquent merchant. So long, therefore, as the merchant seeks to enforce the condemned contract and the debtor defends that contract, his position is the better. But when a new contract is made, upon which the creditor may recover without the necessity of

proving or relying upon the old one, it is no defense for the debtor to say that the old condemned contract is the consideration of the new one, for the creditor does not sue on the old contract, but upon the new one. It is not a question of the existence, or want of existence, of a consideration that is touched by the statute, but of access to the courts; and access to the courts is forbidden only when a claim is made on the condemned contract, and effort made to enforce it by suit.

Let us now look at the facts concerning the license of Burbridge & Houston for the year 1894. On April 25 they paid $25, and secured a license. This license, by operation of law, related back to the first day of the month, and was good for one year from that date (code 1892, § 3408), and authorized the firm to carry a stock of from $5,000 to $7,000. Code, § 3390. The note and mortgage made by Kendrick, which we are now considering, was made on the seventh day of April, 1894, and was therefore legally binding if Burbridge & Houston's tax for that year was of the proper amount. That the tax was of the full amount required by law, the appellant has (1) the only positive, direct evidence in the record, (2) of the only witness who knew of the fact, and (3) the witness is wholly disinterested. The court will find that, from the testimony of this witness, Houston, it positively and unequivocally appears that the stock and goods of Burbridge & Houston never did exceed the sum of $7,000 in 1894. Mr. Houston was a member of the firm of Burbridge & Houston, and knew the facts of which he testified. He had no sort of interest in the controversy, having long ago made an assignment, by which the entire assets of his firm had been devoted to the payment of firm creditors.

*Moore & Clark,* on the same side.

As to the note for $3,075, no privilege was necessary. W. P. Burbridge and R. P. Houston in this transaction were not acting as merchants. While they were partners in the firm of W. H. Jeffreys & Co., and were also doing a mercantile busi-

ness in Batesville, under the name of Burbridge & Houston, yet, so far as this note for $3,075 is concerned, it was a transaction between W. P. Burbridge and R. P. Houston of the one part, and Kendrick and wife of the other, entirely separate from the business of Burbridge & Houston, at Batesville, or of W. H. Jeffreys & Co., at Duncan. It was the result of an individual request from Kendrick to R. P. Houston and W. P. Burbridge, for the purpose of releasing Kendrick from the danger of a foreclosure by Jeffreys & Co.

The money used for this purpose did not come from the business of Burbridge & Houston, at Batesville. The transaction does not seem to have been entered anywhere on the books of Burbridge & Houston, of Batesville, but was kept separate by them, and, as we contend, a transaction of this nature does not require a license. There was nothing in the fact that Houston and Burbridge were engaged in the mercantile business, to prevent them from making any private transaction they saw fit to make outside of that business, and not in pursuance of it. The transaction was not made in reference to the business carried on at Batesville or at Duncan, and the statute, § 589 of the code of 1880, condemns only that class of contracts which are made in reference to the business which is taxed. They could have as legally made this negotiation with Kendrick as they could have bought land or speculated in any other class of property outside of their firm's mercantile business. The proof in this cause shows that the money was borrowed from R. H. Moore, and was not taken from the mercantile business, and that the transaction was not one had or done in connection with, or in pursuance of, the mercantile business of Burbridge & Houston, but was such a transaction as any man might have engaged in without violation of the law. *Graham* v. *State,* 71 Miss., 208. If we are correct in this contention, then it is clear that the note for $3,075 being still unpaid and long since due, the sale of the lands for that debt, made under the trust deed, as set up in the supplemental bill, would convey title,

and the appellant, Pearson, was entitled to a decree confirming his title under the sales made, as set forth in his supplemental bill. This conclusion would follow, even though the court was of opinion that the note for $1,888.65 was not enforceable and was not good because of the want of a privilege license on the part of Burbridge & Houston, and even though the trust deed provided for a security for advances to be made by Burbridge & Houston, and for which advances they could not claim relief through the courts, because of their failure to comply with the revenue laws.

The note for $3,075 is secured by the two first trust deeds named: one made in January, 1891, and one made in April, 1892. The entire indebtedness for advances made by Burbridge & Houston being settled in full by the defendants, who have now no right to demand repayment for the same. So far as those advances are concerned, and so far as payment of those advances have been met, there would have been a compliance with the agreement between Burbridge & Houston and Kendrick, and this compliance is one with which the courts would not and could not now interfere. The note for $3,075 having been executed for the benefit of the defendant, in a matter totally disconnected with the business of Burbridge & Houston, would be enforceable and collectible, notwithstanding the failure of Burbridge & Houston to take out a sufficient license. See *Caradine* v. *Wilson*, 61 Miss., 573, in which the court holds a mortgage made to secure two promissory notes, the consideration of one being legal, can be enforced for the payment of a note of which recovery can be had at law. There being no legal defense which could be made to a suit on the note for $3,075, recovery could have been had on that note at law, and appellant was, therefore, entitled to enforce security for the same, notwithstanding the fact that this security or trust deed was intended to cover also another debt distinct from this note, and which was objectionable because of the failure of Burbridge & Houston to take out privilege license. Numerous cases sup-

porting this proposition are cited in the case of *Carradine* v. *Wilson*; referred to particularly, 1 Jones on Mortgages, sec. 620; *Cotten* v. *McKenzie*, 57 Miss., 418.

It is contended by the appellants that the facts show that the contract between Kendrick and Burbridge & Houston is amply and fully protected by the payment of any and all privilege licenses required for that purpose. The burden of proof is on the appellee in this matter to show that Burbridge & Houston were doing business without a sufficient privilege license, and they have failed to meet it.

It may be contended that the considerations of these contracts were for money, goods and supplies furnished when Burbridge & Houston were doing business without license, and that the subsequent compliance with the law would not protect transactions which occurred during the time when the parties were not protected by the license. The answer to this proposition is, of course, clear and simple. The law does not render the transaction absolutely null and void; it simply gives to the debtor, under these circumstances, the right to resist payment of the contract or obligation incurred during the time when no license was held by the debtors, but it does not forbid or prevent a voluntary compliance with the terms of the contract by the debtor, and if the debtor does voluntarily perform the contract, he will be forbidden to complain himself, nor can any of his creditors or anyone else complain afterwards. *Crum* v. *Carrington Shoe Co.*, 72 Miss., 458.

We also call the court's attention to this additional thought in regard to this statute. Section 589 of the code of 1880, and § 3401 of the code of 1892, unlike the act of 1875, does not declare contracts made by parties doing business without license absolutely null and void, but declares these contracts void only so far as such person may base a claim upon them, and a suit shall not be maintainable in favor of any person on any such contract. That this is the true construction of the law is conclusively shown by all of the decisions of this court.

*Deans* v. *Robertson et al.*, 64 Miss., 195. The case cited was a suit in which the debtor sought to have canceled a note and trust deed given by him to a merchant for goods purchased. The contract having been executed while the merchant did not have a sufficient privilege license, and the court recognizes the fact that there was a contract between the parties, upon which a sum of money was justly due, and relief was denied until the party seeking equity should do equity. Before such a principle could have been applied, the court must be satisfied, and was satisfied in this instance, that the merchants were entitled, in all fairness and justice, to the payment of their money. It recognized that there was a valid claim in the merchants against the debtor. If there had been no such claim, the doctrines of equity could not have been invoked. There was a right which was protected in this instance in a negative way, before right was recognized fully and completely. So in the case of *Crum* v. *Shoe Co.*, 72 Miss., 458, where the parties had voluntarily performed the contract between themselves, the court refused to set aside this executed agreement, because of the fact that it there again recognized the parties had rights which were just and legal as between themselves. The same principle runs through all of the decisions of this court—that is, a recognition of the rights of the parties to the contract, although refusing to enforce those rights. *Peoples' Bank of Meridian* v. *Alabama Great Southern R. R. Co.*, 65 Miss., 365; *McIver* v. *Clarke*, 69 Miss., 408; *Bank of Oxford* v. *Town of Oxford*, 70 Miss., 504; *McIver* v. *Clarke*, 71 Miss., 444; *Woolen Co.* v. *Building & Loan Association*, 73 Miss., 516.

By section 24 of the state constitution, it is provided that all courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right shall be administered without sale, denial or delay. The acknowledgment of the rights of the parties gives them the full right to enforce the same by an application to the courts, where the parties themselves cannot

agree or will not perform their obligation. There is a binding obligation on the part of the debtor to perform his contracts, and if there is no such binding obligation, then the legislature cannot make it binding by any subsequent act, since the legislature could not impair the obligations of the contract. They are forbidden to add to or take from these contracts one particle of their obligation. Any legislation which prevents all legal remedies on contracts, or so changes or obstructs these remedies as to materially impair the value and benefit of the contract, are violations of the contract, and are within the prohibition of the constitution of the United States. Acts of the legislature suspending the portion of the laws for the enforcement of contracts, are in violation of the federal constitution, as well as of the constitution of this state. *Coffman* v. *Bank of Kentucky*, 40 Miss., 29.

When a privilege license is issued, it is presumed, until the contrary has been proved, that the officers issuing such license have done all that is required of them by law, and, in this instance, it is to be presumed that before issuing a license of $20, the tax collector took the necessary proof, under § 3410, as to the amount of stock which Burbridge & Houston would carry during the year 1891; and, as the license authorized a capital stock not exceeding $5,000, it is to be presumed that before the issuance of a license, affidavit was made and filed with the tax collector that not more than a $5,000 stock was, or would be, carried during that year by Burbridge & Houston. No proof was made, or attempted to be made, by the defendants (appellees) that this section was not complied with, and this affidavit should be taken and considered as a part of the necessary proof in any attempt, on the part of the appellees, to avoid liability on their contracts because of a failure to procure the necessary license. Presuming that this affidavit was so made, therefore we have, in support of the contract, the sworn deposition of R. P. Houston, to the effect the stock never, at any time, exceeded $5,000, and also the presumption that, at the

time the licenses were issued and at any and all times during the year 1891, Burbridge & Houston did not, at any time, have a stock exceeding $5,000. The same reasoning applies to all of the other licenses shown to have been in existence.

Every man is presumed to act in obedience to the law and to be carrying on a legitimate business until the contrary has been clearly shown. We again here call the attention of the court to the fact that no proof has been made, or attempted to be made, by the appellee as to whether Burbridge & Houston had license prior to November 1, 1891, when the presumption is that they were sufficiently covered up to that time. Since the law, *ex vi termini*, gives life to the license from the first day of the month of November, 1891, it would be good from the first day of that month, whether the sheriff dated it November 1 or not. Under the law the courts will consider the license as if it had been dated the first day of November, 1891, and will not inflict the penalty upon the appellant, of a forfeiture of his contract because of any failure, on the part of the officer, to do his duty in this respect. Burbridge & Houston had complied with their duty when they went to the tax collector's office, applied for the license, paid their money, and received a receipt, as required by law. This fully protected them, and this fully protects the contract in the hands of an innocent purchaser from them, and they cannot be held responsible for the omission or inadvertence of the officer in issuing the license. The object of the law was to compel the payment of the tax, and that object was fully accomplished when the tax was paid and the license was issued, as was shown to have been done by the transcript from the sheriff's books. The statute is highly penal in its provisions, and will be strictly construed for the protection of the taxpayers.

If the original license had been introduced in evidence, it could not have been objected to by the appellees, because of the fact that it bears date of November 16 instead of November 1, 1891, nor would the fact that the sheriff had indorsed on it that

the license was intended to cover transactions prior to its date, have any effect whatever upon transactions subsequent to the first day of the month of its issuance, it being beyond the power of the officer issuing the license to limit it in its effect by any contract of his own, or to make it extend beyond the purposes of the law. An attempt, on his part, so to extend or to contract the license would simply amount to nothing, and the courts will read the license as if it had been regularly issued and dated on the first day of the month of November, 1891.

Appellees will contend, in response to this position, that even if we are correct in this statement of the law, that the contract was dated January 27, 1891, ten months before the issuance of the license, and that the license did not cover the transaction, because the license was not issued until November, when the contract was made in January preceding. There are two answers to this—first, that the appellees have introduced no evidence to show that Burbridge & Houston were not properly covered by privilege license prior to the first day of November, 1891; second, that on the seventh day of March, 1892 (Laws, pp. 31 and 32), an act was passed granting relief from the penalties imposed by section 589 of code of 1880, and covering the contract in question.

Referring to the transcript from the sheriff's books, we find that on April 26, 1892, Burbridge & Houston paid $20 for another privilege license, and that in May, 1892, they paid an additional sum of $5.

The act of 1892 did not require that the sheriff should show on the face of the license that it was issued under that amnesty act. Now, Burbridge & Houston, according to the sheriff's transcript, had taken out license November 16, 1891, to the amount of $20, and conceding, for the sake of argument, that their stock of goods exceeded $7,000, it would have required a license of $30 to cover their business. Adding twenty-five per cent. to this sum, would make it requisite for Burbridge & Houston to have paid, all told, $37.50, whereas, the records

show that they actually paid $45, or $7.50 in excess of what they would have been required to pay to enable them to carry a stock of goods not exceeding $10,000. The privilege taxes paid by Burbridge & Houston were such as would have enabled them to have carried a stock of goods to the extent of $12,000, and this amount is in excess even of the claim of appellees themselves, and since these payments were made within sixty days after the passage of the amnesty or relief act of 1892, and during the time required by that act, that would validate the contract of January 27, 1891, and also the second trust deed of March 5, 1892, both securing the note for $3,075. So that in any view that may be taken of this case, both the contract of 1891 and of 1892, sought to be protected and foreclosed, are simply covered by these privilege licenses and must be enforced on the application of Pearson. As to the contract of April 7, 1894, the sheriff's record shows the payment of a license by Burbridge & Houston of $25, which enabled them to carry a stock of goods not exceeding $7,000, and Houston testified that the stock of Burbridge & Houston did not, at any time during the year 1894, exceed $6,000. This license, in 1894, was issued on April 24, 1894, but for the terms of the law, that license bore date of April 1, 1894, and covered all transactions for twelve months from that date, including in such time the trust deed of April 7, 1894, and the note for $1,888.65.

We further call attention to the fact that the transcript from the sheriff's books shows that the license was actually issued on the date therein mentioned, but there is nothing on the face of this transcript to indicate that the licenses were not dated on the first day of the month of their issuance, as required, and it will be presumed that in each case the sheriff dated the licenses on the first day of the month of their issuance, simply entering upon the book the day of the month on which the license was in fact issued.

The sale of the lands as set forth in the supplemental bill was valid, and the deeds executed by the trustees therein named

conveyed good and perfect titles to Pearson, the purchaser, and the prayer of the supplemental bill should have been maintained by the court. These sales were made in pursuance of the powers vested in the trustees by the contracts between the parties. The pendency of the suit for foreclosure did not destroy this right in any way. Am. & Eng. Enc. L., pp. 881, 883.

*Fontaine Jones, Butt & Butt* and *McWillie & Thompson*, for the appellees.

The evidence shows that none of the merchants mentioned ever had an adequate privilege license. Certainly Burbridge & Houston never had one; and that the loan to Kendrick was made by them is too plain for disputation. The note was payable to them; they were the beneficiaries of the trust deed, which, besides the $3,075 note, secured other advances to be made by them during the year 1891. They got two-thirds of the $3,-000 raised on the note and trust deed, and charged Kendrick, for making the advance, two and one-half per cent., or $75, which brought the amount of the note up to the figure stated. *Bowdre* v. *Carter*, 64 Miss., 221. The fact that a contract may beneficially affect another business, as well as the one illegally conducted, does not destroy its reference to the latter, in which it was made and which it also beneficially affects. That the business carried on by Block and W. H. Jeffreys & Co. was illegally transacted, is perfectly clear. The only privilege licenses ever issued to Burbridge & Houston are shown by the agreed list made out by the sheriff of Panola county. This list or certificate shows that on January 27, 1891, the date of the note for $3,075 and trust deed securing same, Burbridge & Houston had no privilege license of any kind, the license for 1891 having been taken out November 16, 1891, when only $20 was paid for it, which would cover a $5,000 stock of goods, but no more. The second trust deed is for $4,093.84, dated March 5, 1892, this alleged indebtedness being made up of the old note for $3,075 and the new note for

$1,018.18.   The list further shows that Burbridge & Houston afterwards, on April 26, 1892, procured license costing $20, which enabled them to carry a $5,000 stock of goods.

The license dated November 16, 1891, cannot be given effect so as to make it good for one year from that date, because the license itself, as worded and shown on its face, expired January 1, 1892.   In fact, all the licenses were made to run and cover periods different from the requirements of the law, and were, we contend, fraudulent and void *in toto*.   They were not issued in accordance with the statute, and to give them any effect whatever would inevitably lead to confusion, and result in the encouragement of fraudulent practices and loss to the state of a part of its revenue.   Section 594, code of 1880, provides that the license shall be dated on the first day of the month of its issuance, and shall be good for one year from that date, and § 3408, code of 1892, uses the same language; but we have no such license here except the one issued January 1, 1893, which cuts no figure in this case, because neither of the notes or trust deeds were executed during 1893.   But, for the sake of the argument, suppose we give the license of November 16, 1891, effect of one year from that date, so as to cover the trust deed of March 5, 1892, what do we find?   This license would cover a stock of goods of the value of not exceeding $5,000.   It is true that Houston testifies that in 1891 they never had in stock more than $5,000 worth of goods, but, on cross-examination, contradicts himself.   February 8, 1895, is the date of the Burbridge & Houston assignment, and the assignment, which is sworn to and subscribed by them, shows the amount of stock then on hand $9,000 including fixtures $200; total amount of stock, $8,800.

In addition, we have the deposition of J. T. Butt and the testimony of Houston that, in 1892, the only time it would seem that an inventory was taken, that the stock amounted to $6,600 and more, and that the largest amount of stock carried in 1892 was $7,000.   In view of all this, is it possible for

this court to escape the conclusion that, on March 5, 1892, the
date of the taking of the trust deed securing the notes aggre-
gating $4,000 and more, Burbridge & Houston carried a stock
in excess of $5,000 ? We think not. We have not discussed
the payment of $5 for 1892, in May, "additional amnesty,"
for the reason that while it is a confession on the part of Bur-
bridge & Houston that they had insufficient license to protect
them, yet the attempt, if it amounted to an attempt, to comply
with chapter 41, acts of 1892, p. 33, was abortive, because the
act required the payment of the privilege tax for three years
next preceding March 7, 1892, together with twenty-five per
cent. additional. It is obvious that the payment of only $5
was wholly insufficient to relieve them from the penalties in-
curred by reason of previous defaults.

The third and last note sued on, for $1,888.65, was executed
April 7, 1894. Burbridge & Houston at this date had no priv-
ilege license, but afterwards procured one for $25 for 1894,
license issued April 25, 1894, time to run from January 1,
1894, to January 1, 1895. We again insist that it is absolutely
void because of the fraud apparent upon the face of the record,
but also subject to an objection as being for an inadequate
amount. A $25 privilege license would only justify the licensee
in carrying a stock of $7,000. The record shows that, on Feb-
ruary 8, 1895, it amounted to $8,800, and we submit that the
other proof above referred to shows that they carried a stock
in excess of this amount. At the time of the Burbridge &
Houston failure we have shown, by their own figures, that
their stock amounted to $8,800.

It is urged on behalf of appellants that there is nothing in
the record to show that Burbridge & Houston were not fully
protected by an adequate privilege license when they paid for
and took out the $20 license on November 16, 1891, and
prior thereto during the year 1891. We think there is a good
deal to show that fact. The certificate of the sheriff read in
evidence purports to show the licenses issued to the firm for

certain years, or, as he expresses it, "the following years," 1891 being among the number, and for this year he only shows one license issued on November 16, 1891, for $20. This is all the competent evidence on the subject, and it appears that this license issued on November 16, 1891, was issued by the sheriff "to run from January 1, 1891, to January 1, 1892." Of course the license only extended back to November 1, 1892, but the fact that the sheriff so issued it and Burbridge & Houston so accepted it strongly indicates that the firm had no previous license for the year 1891, or is at least enough to shift the burden of proving that they had none from the defendants to the complainants. The burden of proving a negative is not always imposed upon the party relying upon it, when the other party may justly be presumed to have peculiar knowledge of the facts in relation to it. So far as our observation extends, there is nothing in the record to show that the licenses issued to Burbridge & Houston were ever destroyed and are not easily accessible to complainants. In such a state of case very slight circumstances are sufficient to shift the burden of proof. 5 Am. & Eng. Enc. L., 30–42; *Easterling* v. *State*, 35 Miss., 210.

Opposing counsel also contend that their payment of $20 November 16, 1891, which, according to the terms of the license, was to cover the time extending from January 1, 1891, to January 1, 1892, should be added to two payments—one of $20, made April 26, 1892, and the other of $5, made in May, 1892, and the aggregate of $45 be treated as a payment under the amnesty act of 1892. Laws, pp. 31, 32. There are several difficulties in the way of doing this. In the first place, the $20 payment on November 16, 1891, was made for a different purpose and before the amnesty act was passed. In the second place, the $20 payment, made April 26, 1892, was, by the terms of the license, made to cover the current year's business, and not to secure amnesty for past delinquencies. In the third place, no matter how we regard these payments and the other

$5 payment made in May, 1892, there is nothing before the court to show that the terms of the amnesty act were ever complied with. The act required payment of the privilege tax for three years next preceding its date, March 7, 1892, together with twenty-five per cent. additional, and it must be shown affirmatively that the terms of the act have been complied with, in order to claim its benefit. There is nothing in the record to show payment of the tax for three years previous to March 7, 1892, or, in fact, any payment of any amount prior to November 16, 1891.

The objection to the testimony of J. T. Butt cannot be considered here, as it was not made in the court below. He was not even cross-examined. Code 1892, § 1758; *Jones* v. *Loggins*, 37 Miss., 546. Pearson, the purchaser under the trust deeds, has no greater right than Burbridge & Houston, the beneficiaries thereof. *Williams* v. *Simpson*, 70 Miss., 113.

Argued orally by *T. E. Cooper*, for the appellants, and by *T. A. Mc Willie*, for the appellees.

WHITFIELD, J., delivered the opinion of the court.

It is clearly shown by the testimony that every one of the trust deeds the foreclosure of which is affirmatively sought by the appellant, was executed at a time when no sufficient privilege tax had been paid. Block never had a license till February 1, 1889; that trust deed was made January 4, 1889; W. H. Jeffreys & Co. never at any time had a license; W. H. Jeffreys, individually, had no license till March 1, 1890, and his trust deed was made, as the one to Jeffreys & Co. recited, January 22, 1890. Burbridge & Houston got a license November 16, 1891, and illegally had it recite that it was to date from January 1, 1891, and their first trust deed was made January 27, 1891; that firm got another license April 26, 1892, and illegally had it recite that it was to run from January 1, 1892, and the trust deed of that year was made March 5, 1892; that

firm got another license April 25, 1894, and had it illegally re-cite that it was to run from January 1, 1894, and the trust deed of that year was made April 7, 1894. It was, as were all of them, effective from the first day of the month when issued. There was no trust deed in 1893.

In addition to this, it is overwhelmingly established that all these tax privileges were for insufficient amounts. This result follows without reference to the testimony of Judge Butt. As to that testimony, it is clearly settled, by statute and decisions, that, as no objection was made to it in the court below on any ground whatever, the witness not even being cross-examined, that this court cannot notice objections interposed here for the first time. Code 1892, § 1758; *Jones* v. *Loggins*, 37 Miss., 546. *Vigilantibus non dormientibus*, etc. The $3,075 note was for money loaned by the firm of Houston & Burbridge. The note and trust deed are both payable to that firm, whose charges were two and one-half per cent. commission for advancing it; and the deed provided further that it was to secure also sup-plies to be advanced during that year, 1891. They were coun-try merchants, doing the usual, well-known business of coun-try merchants, on a credit, and they were not shown to be engaged in any other business. That firm got the benefit of two-thirds of the $3,000 in payment of alleged indebtedness of appellees to Jeffreys & Co. It is entirely immaterial that Bur-bridge & Houston got the money from Moore on this trust deed as collateral security. Moore had been fully paid, and had sur-rendered the trust deed to Burbridge & Houston, and he has nothing to do with this controversy. The question is, who loaned this money to appellees? The firm of Burbridge & Hous-ton manifestly was their lender, and it was no concern of theirs where that firm got the money. They did not deal with Moore. The suggestion that the money was paid to Jeffreys & Co., a so-called third party, is utterly without merit. Houston shows that the alleged debt of appellees to Jeffreys & Co. became the property of Houston & Burbridge before the execution of this

note and trust deed. His subsequent change of base cannot avail. It does not satisfy us. We think, besides, appellees' account of the purpose of this loan is the correct one. This advancing of the sum of $3,000, under the facts in this record, falls clearly within *Bowdre* v. *Carter*, 64 Miss., 221. There is no merit in any of the other suggestions on this point. Merchants who defraud the public revenues and refuse to pay their just taxes, occupy poor ground for assailing the interposition by the debtor of their failure to comply with positive law—the exercise by the debtor of a right secured by law.

The decree is clearly correct. We decide the case upon the failure to pay the privilege taxes, deciding nothing else.

*Affirmed.*